(C. D. 977)

S. B. Penick & Co., Inc. *v.* United States

United States Customs Court, Third Division

(Decided January 23, 1946)

*Strauss & Hedges; Barnes, Richardson & Colburn* (*J. Bradley Colburn* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*William J. Vitale*, special attorney), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

KEEFE, Judge: This action involves the classification of certain iron drums imported from Portugal. Duty was assessed thereon at 25 per centum ad valorem under paragraph 328 of the Tariff Act of 1930, providing, so far as applicable, as follows:

PAR. 328. * * * cylindrical and tubular tanks or vessels, for holding gas, liquids, or other material, whether full or empty; * * *

The plaintiff claims that the drums are free of duty as the usual coverings or containers of specific-duty or duty-free merchandise, and alternatively that the drums are free of duty as American goods returned. The latter claim was not pressed at the trial.

We believe the evidence fairly well establishes that the drums in question are composed of iron or steel, measuring 22 inches in height by 19 inches in diameter. The tops are described as containing friction caps about 6 inches in diameter which fit down over flanges in the drums so that the tops present flat surfaces and the caps are soldered after pressing them down into the heads of the drums. It was also established that the drums when imported contained a product known as ergot of rye, the particular material imported in the drums in question being used for manufacturing purposes in the company's mill. It was also established that it is necessary to ship ergot of rye in airtight containers, and that it was necessary to open the containers with the use of a hammer and chisel to break the seals.

The plaintiff's control chemist testified that the lids of the drums were "completely sealed, solder-tight" and in order to open them it was necessary to break the seals with a hammer and chisel leaving very jagged edges and bending the caps to a considerable extent. The witness further testified that the drums after opening were not reused as containers and that, after sampling, the ergot of rye was

placed in similar containers, if destined to be shipped to plaintiff's customers, and that the original drums were "discarded so far as I know" (Record, p. 21).

However, on cross-examination, this witness admitted that the ergot of rye flows freely from the containers; that his records did not indicate the condition of the drums; that he did not have any independent recollection pertaining to these particular drums except what appeared on his records; that he was testifying from his general recollection of ergot-of-rye drums; that he did not know the condition of these particular drums nor did he know whether or not the ergot of rye was to be packed into the same drums; and that he could not testify from his own knowledge that the drums in question were discarded.

The shipping and receiving clerk of the importer testified that he examines every package coming into the plant; that he did not remember this particular shipment of drums, and that his testimony refers to the general average of shipments received; that the lids of ergot-of-rye drums are either brazed or welded on; that when brazed a mixture of brass and lead is spread around the edge and put all over the lid, and that the drum is soldered right through the head and through the top of the drum; that to loosen the lid from the adhesive material and from the drum it was necessary to pry underneath the flange of the head; and that, in so doing, indentations are caused on the top of the drum leaving a ragged edge around the opening in the drum and also around the edge of the cap.

The witness further testified that, after ergot-of-rye drums are emptied, they are put up on the roof of the plant in the junk pile; that when a quantity has accumulated the company tries to sell it as scrap metal; that the drums are never used as containers after once having been emptied of their contents and in his opinion could not be processed to refit them for use as containers of any merchandise; that the company has never been able to sell the drums; that the drums are given to the junk dealer free of charge because the junk dealer maintained that it would cost more to flatten the drums than the material in them was worth; and that at times the junk dealer will not take them at all, and this type of drum is loaded on one of their own trucks and taken out to the dumps. The witness was unable to state what disposition was made of the drums in question.

The United States sampler testified for the Government that he examined the condition of the drums up to 50 per centum of the lot; that he actually opened one drum of the lot in order to obtain a sample of the contents; that he found the lid was forced down into the drum and soldered in four or five spots to hold it in; that the remaining drums he examined were similarly soldered; that he removed the lid by means of a hammer and chisel; that with the use of

the chisel he cut the solder in between the flange of the lid and the top of the drum and the lid came right off; that in so removing the lid he did not believe he caused any ragged edge to be formed on the inside of the opening; and that when the sample was withdrawn the lid was replaced and forced down into the drum but not soldered. The witness admitted that his only recollection of the shipment in question was based upon what his report contained to the effect that the drums were in good order; that it did not contain anything as to spot-soldered tops, and that he had no independent recollection as to the condition of the drums other than from what appeared in his report.

A customs agent testified that he called at the plaintiff's plant and was shown a drum said to have contained ergot of rye; that he examined it and failed to find that the opening had a ragged edge; that the lid also was perfectly smooth and there was no cut or indentation of any kind on top of the drum.

We are of the opinion that the evidence fails to disclose that the drums in question are of a class subject to free entry as containers of specific-duty or free-of-duty goods. With the exception of the Government sampler who opened one drum of the shipment in question, the witnesses in this case referred generally as to the class of drums from their records of the shipment. It was not established that the drums fell within the class of one-time shippers. There is nothing in the record showing the gauge of the iron or steel composing the drums. There is no testimony that the contents, to wit, ergot of rye, were of such character as would preclude the reuse of the containers, nor that it was necessary to chop off the heads of the drums in order to remove the contents, or to facilitate the removal thereof. Nor was it established that the imported drums were unsuitable for use after the removal of their contents, or that after removal, the drums were destroyed. There is no showing made that these drums could not be reconditioned, nor that they did not enter the commerce of the United States in competition with other drums. While there is some testimony that the customary manner of handling them after emptying was putting them on the scrap pile, there is no testimony establishing that these particular drums were broken up, put on the dumps, or how they were disposed of.

In *Foster* v. *United States*, T. D. 47922, cited by the plaintiff, metal drums, imported as the ordinary containers of magnesite, had a small cover so constructed that it could be removed and replaced without injury to the drum. The court held that such drums were entitled to free entry as the ordinary containers of a specific-duty merchandise in view of evidence fully establishing that the drums were of light construction and one-time shippers; that they were made specially as containers of magnesite; that the contents of the drums were removed

by chopping off the top of the drum because magnesite was packed so solidly in the drums that it could not be taken out of the small opening; that it became the regular practice in the plaintiff's business to remove the magnesite from the drums in such manner as to expedite the emptying thereof; and that after emptying, the drums were discarded as worthless.

The court further set out the principles governing the free entry of one-time shippers as follows:

It is clear, therefore, that iron drums are subject to duty under paragraph 328, unless, when emptied of their contents, they are precluded from being mingled with other drums in the commerce and trade of the United States. The test then is not one of use, but rather of suitability. When drums are imported as containers of merchandise, the collector determines whether they are suitable for use as merchandise after the removal of the contents. The only manner in which he can determine their suitability, in the absence of judicial inquiry upon that particular sort of drum, is from their construction and provision for refilling and emptying. If the importer is able to prove that the drums, when imported, were in a condition which precluded their being of further commercial value as containers after the removal of their contents, or that the condition of their contents was such that it has been the general commercial practice to destroy the container in the removal of the contents, or that the nature of their contents precludes their further use commercially as containers of merchandise, and that the drums did not, in fact, enter the commerce of the United States in competition with other containers, they are excluded from the provisions of paragraph 328 and subject to the same classification accorded their contents. If containing free or specific-duty goods, they are free of duty. However, we might add that the deliberate destruction of the drums after importation because of the inability of the importer, due to market conditions, to find a purchaser, or in the hope that such action would relieve him from the payment of duty upon the drums, is insufficient evidence upon which to base a finding that such drums were to be regarded as one-time shippers and had exhausted their usefulness after being emptied of their contents. But when the contents of drums are in such condition that the use of the bung or other emptying device would be contrary to the usual commercial practice, or not feasible, or impossible, the importer is not required to empty drums in such manner, even though the removal of the contents by the means employed would destroy the drums for further commercial use, and bring them within the rule of one-time shippers.

In *United States* v. *Murphy*, 9 Ct. Cust. Appls. 248, T. D. 38206, also cited by the plaintiff, the containers in question consisted of round tins which were packed in close-fitting wooden drums or in barrels. The material in the tins was hydrosulphite of soda, a dry material which required protection from moisture. Some of the tin containers were soldered tight and could not be opened without destroying the container, as the entire top of the tin had to be cut off in order to remove the contents. Part of the tins had friction covers which could be pried off with a chisel without destroying the containers themselves. The appellate court held as to such portion of the containers which had to be cut open and thus destroyed in order to remove the contents, that free entry should be accorded. As to the tins with friction covers,

which are comparable with the drums here in question, the court stated:

> \* \* \* As to the other one-fourth, however, consisting of containers with friction tops which apparently may be pried off without injury to the vessels themselves, while there is no evidence in the record to show that these are ever used again after they are once emptied of their contents, or that they are sold again for any purpose; yet we do not think that the testimony concerning them is sufficiently clear to overcome the force and effect of the collector's assessment. \* \* \*

We are unable to find here that the plaintiff has established that the collector was wrong in his assumption that the imported drums were capable of use or used again in competition with other drums as containers of merchandise. As the presumption of correctness of the collector's classification has not, in our opinion, been overcome, judgment will be entered in favor of the Government.